The next case we're going to hear this morning is United States v. McDonald and Ms. Trodden, whenever you're ready, we'll hear from you. Good morning, Your Honor, and may it please the Court. I'm Erin Trodden on behalf of Jennifer McDonald. The District Court made several errors in this case that singly and in combination require reversal. I'd like to focus today on two of those errors, the denial of Ms. McDonald's motion for judgment of acquittal on the aggravated identity theft charge and the denial of her motions for mistrial. First, with respect to the aggravated identity theft, Ms. McDonald's... Does this relate to the use of Tran? Yes, it does. Ms. McDonald's conviction under this statute cannot be squared with the Supreme Court's decision in United States v. Dubin. In Dubin, the Supreme Court made clear that for an identity theft to be aggravated under the statute, in other words, for it to be committed during and in relation to another offense, it must be at the crux of what makes that underlying offense criminal. In other words, it must do more than be ancillary to the offense. It must do more than facilitate the offense. It must do more than be a but-for cause of the offense. It must essentially be the basis of what makes that offense criminal. In other words, under the Supreme Court's construction, the underlying offense has to rely on a fraudulent who rather than a fraudulent how or why. That's not the case here with respect to the use of Mr. Tran's means of identification. In this case, the underlying offense was the wire fraud charged in count one. That related to a transfer of two million dollars. Yes, Your Honor. And that was set up in a contract with Mr. Tran as the purchaser. Who signed that contract? Who signed the contract? Not Mr. Tran. That contract, however, is not the basis of the wire fraud in count one. That is sort of the second step. Without the contract, there would be no transfer. No, Your Honor. And under the contract, who was it that changed the names in order to facilitate the wire transfer and signed it for Mr. Tran? Not Mr. Tran. And that's, for purposes of this appeal, we agree with that. But, Your Honor, I think we have to take a step back because the transfer that is charged in count one is the transfer of the two million dollars out of EDA's bank account into an account at the settlement company at TLC Settlements. That transfer is not based on that contract in any way. That transfer has nothing to do with that contract. That transfer occurs because under the government's evidence, Ms. McDonald represented to First Bank, which was EDA's bank and held EDA's funds, that those two million dollars were needed in order to fund an escrow that the Virginia Department of Transportation required. In other words, which they did not. This was the government offered evidence to the effect of this was a fraudulent statement. But that did not involve the use of Mr. Tran at all. So, in other words, if the government had not offered any evidence regarding Mr. Tran, regarding the fraudulent use of Mr. Tran's identity, the government would still have had sufficient evidence to prove the wire fraud in count one. The wire fraud in count one did not rely on the use of Mr. Tran's means of identification at all. The district court erred in denying the motion for judgment of acquittal, relying, I think, on the fact that the proposition that you raged, Judge Agee, that the use of the means of identification was involved in the greater scheme to defraud. But that's not actually the question that Dubin requires courts to ask. Under Dubin, the court has to look at what is the heart of the conduct that makes this offense criminal. And looking at that, we look at the elements that make the offense criminal and what the government's proof of those elements are. Now, wire fraud only requires a scheme or artifice to defraud, an intent to defraud, and a wire transfer in interstate commerce. What's that wire transfer in interstate commerce? What's the scope of the scheme? The scheme to defraud alleged in the indictment is the scheme to defraud the EDA. So it's extremely broad. Mr. Tran, the use of Mr. Tran's means of identification broadly is part of the process that the government offered proof of, of how this money ultimately got into Ms. McDonald's pockets. But that's not required for wire fraud. Isn't it part of the scheme? It may be part of the scheme, but Dubin could not be clearer that the court looks at what makes the offense criminal. And the scheme to defraud is not a wire fraud. Wire fraud requires more than that. And so looking at what makes this offense of wire fraud criminal. You're insisting that Tran be part of every element, but it seems to me it just has to be, I mean, if you don't have a scheme, you don't have a claim, do you? You've got to have a scheme. A scheme is necessary but not sufficient, Your Honor. Well, I understand that neither, none of the elements are sufficient. They all have to be there. But the question is how important is it? Does it go to the core criminality aspect? And I think that that is, that is what that question, my point earlier, answered with respect to if you didn't have Kurt Tran in this at all, could the government still prove wire fraud? Well, you have to start, you want to just focus on the transfer, but the whole scheme, it seemed to me, whether it's necessary or not, it was factually there. That Tran was the mechanism by which she carried out her scheme, it seems to me. But maybe I'm missing something or don't understand the facts. Tran is a, the scheme to defraud alleged in the indictment is extremely broad and it's just a scheme to obtain money from the EDA through a variety of means. Well, an element, as you point out, is not sufficient for a, the whole crime, but it's a necessary element. And the question whether it's an important element, I think, is the test, sort of, the core of criminality. It can't be something collateral or frivolous. But I think your argument is tending to suggest, and maybe it is, that's the way it's being done, but that it has to, I don't know, he has to be involved in every element. I think that the court has to look at what does the government need to prove in order to prove this wire fraud. Yeah, but we agree they have to prove a scheme. That's one element. Right, but the government proves this, the government proves the wire fraud. They have, there's another scheme. The government proves the wire fraud without Mr. Tran. Mr. Tran's not here, the government still proves the wire fraud. Because Ms. McDonald made this representation to First Bank, that EDA needed this money for a completely different reason that was also fraudulent. If you look at every post-Dubin aggravated identity theft case that the parties have identified, in every one of them, the underlying offense has relied on the fraudulent use of someone's identity. And I point this court to the opinion in United States v. Jackson, which this court recently decided, where dealing with the fraudulent declarations submitted, which were the basis of the identity theft charge in that case, and also the basis of the fraudulent statements to Medicaid, who created and signed those declarations was essential to the qualifying offenses fraud. In other words, by submitting these fraudulent declarations to Medicaid, the defendant in Jackson both committed wire fraud or committed the Medicaid fraud offense and committed aggravated identity theft. That's not the case here. That was also forgery. It was, Your Honor. And the Second Circuit recognized in. But how in this case, so you have a wire transfer, Ms. McDonald doesn't have her hands on the money. She didn't get her hands on the money except by the use of Mr. Tran's name. That's correct, Your Honor. And the district court properly instructed the jury that wire fraud does not require the defendants to get their hands on the money. A wire fraud is complete. Again, that's part of this whole scheme. If you don't have the forgery to begin with, she doesn't get the money. If you don't have the forgery afterwards, she doesn't get the money. And it seems like you're carving out this very pristine element, if you want to call it that, in the middle that just ignores the whole package. I want to make sure I correct you, Your Honor, with respect to she didn't have the forgery to begin with. Because what got the money out of the EDA's accounts and into the settlement company's account did not relate to Mr. Tran. Mr. Tran did not use his means of identification. It was a different fraudulent statement that got that money into the settlement company. There's no testimony from the settlement company that they required any particular verification or information in order to be able to accept that money. The wire fraud is complete. And we're talking about the offense of wire fraud. Dubinis is looking at what makes that conduct criminal. But the offense of wire fraud is complete when the wire transfer occurs. The scheme to defraud in that case would have been telling the EDA's bank that they needed to transfer this money for this faked out... But why do you get to narrow down the scheme that was actually approved? In other words, the scheme that was actually approved involved Tran. And you're suggesting that, well, that was unnecessary to prove it. But they did prove it as part of the scheme leading to the wire fraud. Their argument is that it's element-based. You don't have to have every element linked to it. And the question is whether Durbin requires that every element or pick a particular element to make Tran involved. I'd like to go reread Durbin, but... And I would suggest that Your Honor take a look also at Gladden and Omotayo. So the Gladden case may be instructive because in that case there are actually two aggravated identity theft charges. One of them is sustained where the defendant is sending fraudulent information regarding which patient is receiving medication. That's aggravated identity theft. They also change who is receiving, whether the patient is actually getting the medications if they're medically necessary. And the court found in that case the use of the patient's information is ancillary. And I think what your question goes to is, is the use of Mr. Tran's means of identification here ancillary? It's part of the broader scheme by which this money was, Ms. McDonald got this money, but it's not part of the wire fraud charged in count one. So if we agreed with you on this, on the wire fraud argument, but we didn't agree with you on anything else, what would happen? The case would be remanded for resentencing. You'd get two years off, right? We would certainly ask for it, Your Honor. Now I would like to turn to the mistrial motion, if I may, unless the court has other questions regarding the wire fraud. The district court abused its discretion in denying the mistrial in this case. Essentially there are some hiatuses in trial that are so long that we can't reasonably expect jurors to be able to remember and make decisions based on the evidence that they heard after those hiatuses. And this was one such. There's a couple of issues on this, and I just bring them up so that you can focus on them. Number one, it looks like this is almost squarely in line with the Smith decision, with 32 days there and 34 days here. And the various things the court said there were sort of verbatim here by this court in managing the time. This case had the additional element that there was some suggestion that the defendant might have been malingering and taking advantage of these times and creating these hiatuses. She was seen shopping and this type of thing. And the court was witnessing all this, interchanging with the jury and trying to keep the jury engaged, just as in Smith. And it seems to me this is a highly discretionary and on-scene type of judgment that has to be made. And it seemed to me it has to be pretty clear if we're going to step in and say it has to be a do-over in the circumstances. Where I think Smith seems to be paralleled here, and in addition, most of the time is attributable to the defendant in this case. But those are my concerns, and you can express or respond. Thank you. I would love to respond to all of those. First of all, yes, this is an abuse of discretion standard, but that discretion is not boundless, as this court knows. With respect to Smith, there are some salient differences. First of all, this was longer. Smith was 32 days. This was a 37-day hiatus that was unexpected, and that was on top of prior unexpected pauses of about 11 days. Yes, and the basis of the mistrial motion, to be clear, is not those prior pauses. It means less than mistrial that it can use to address this. It has to look at the entirety of the case. It can't have blinkers on as to what has gone before. But second, and I see my time is up, but I would love to respond here. I'll give you another minute. Thank you, Your Honor. In Smith, there were co-defendants, and those co-defendants opposed mistrial. And that raised constitutional questions that I think the court was very concerned about. And one reason why they did not grant the mistrial was because of the presence of those co-defendants opposing mistrial. Finally, in Smith, the judge knew that the pause was going to occur and gave a keep-fresh instruction at the beginning, when the information still was fresh in the jury's mind. That didn't happen here. It was sort of a moving target when the jury understood that trial was going to resume. But the judge didn't give any kind of a keep-fresh instruction until much later, until at least I believe a week had passed. Questioned whether any keep-fresh instruction, frankly, would do the job, given the 37-day hiatus in trial. But finally, Your Honor, and I do want to address the allegations of malingering here, because the district court had a fulsome evidentiary hearing on this. They heard from Ms. McDonald's doctors. They heard extensive testimony about this. And at the end of that, the district court found that they did not find malingering. So the government's now attempting to suggest that that's an issue, but the district court fully addressed that and did not find it, and this court should reject that. Thank you. All right. We'll hear from Mr. Juhand. It happens all the time, Your Honor. In Europe, it could be Johan, but you have a U there instead of an O. May it please the court, Keiko Juhand for the United States. If I may begin by answering first, Judge Agee, your factual question about the Dubin issue, and then, Judge Niemeyer, you asked some legal questions about the Dubin issue, and then open it up to whatever questions that the court may otherwise have. Judge Agee, about the facts in this case, I'd point you to JA 1322-23. That is where Ms. McDonald represents to the settlement company that this money that is part of the wire, the $2 million that she is trying to smuggle out of the EDA's account, she trades on trans identity in order to convince them to accept the wire. She says, this money is Mr. Trans. He accidentally, this locally known businessman. This is before the $2 million is transferred. This is the same day, yes, on September 14th. Well, the question is, has the $2 million been transferred yet? Your Honor, because we stipulated to the wire, I can tell you that it is the same day. I don't think because the wire is stipulated to, we can say exactly the chronology. I think it is a fair inference to draw in our favor from the record. Based on opposing counsel's argument, she says that the defendant got the $2 million transferred based on this claim that the EDA needed it for some environmental remediation or something like that. And that was unrelated to the transactions with Mr. Trans. So if that's the case and there were discussions after the fact, after the wire transfer was already completed, that would seem to be a fairly salient fact. So I take it you're saying that you can't tell us one way or the other. There is not direct evidence in the record to my recollection, and I will double-check after, that specifically gives the chronology of that particular point. But to further elaborate, Your Honor, and just to make clear that we're talking about the same thing, she is correct that there's this VDOT story that is told to... Well, regardless of the scenario, was the testimony at 1322 that you're referring to linked to the $2 million transfer? Yes, Your Honor. That testimony is about the settlement company, a woman named Tracy Bowers, being told by Ms. McDonald this $2 million that she's smuggling out of the EDA's account is Mr. Trans' money. Mr. Trans put it in the EDA account and, quote, we can't keep it there. We, the EDA. So that was the story that she told the settlement company, the one that processes the wire, the transaction, as the holder of that money. That's the story that she told them. That's after they've gotten the $2 million, right? I believe that's, it's the same answer that I just gave to Judge Agee in that it's not... That's important, because that's what Dubin says. It has to be the crux of it. All of the circumstances that might give rise to a scheme does not make it crux. And that's the whole difference. The key is how did the money get sent to, and that's a different type of situation in terms of the identity there, isn't it? There is some difference. I agree with that, Your Honor. I guess what I would also say, and this goes to Judge Agee, your points also, is the transaction we know happens on the 14th, but on the 8th, 9th, and the 13th, there are also facts in the record showing how she uses trans identity in order to essentially grease the skids of that transaction as well. And I was just happy to provide those sites to the court. On the 8th at JA 6637, that's when she sends the forged document that Judge Agee, you mentioned earlier, that's when she sends that to the settlement company. I think this may end up being, we may be required to do a very granular analysis of this. So I think the pertinent facts deal with what representation, if any, was made to get the money from the holding bank to the recipient bank. And it seems like Mr. Tran's name would have to be used on one end or the other of that transaction and not necessarily what went on before or what went after. Your Honor, I think that's a fair, I understand what Your Honor is saying, and here's where I would try to distinguish it. The one in between those two endpoints is the settlement company. The one that actually holds that money between the two banks. If that settlement company balks at that transaction because she says this is just the EDA's money that I'm taking out of the EDA's account, then that transaction doesn't happen. So the recipient bank sent it to another bank or they sent it to the settlement agent? My understanding, Your Honor, is they sent it to the settlement company. TLC is the settlement company. And trial counsel is here in the courtroom and I will consult with them after this to make sure that I am correct on that and let the court know. But that is my recollection from the record. And so I think those are kind of the factual circumstances leading up to it. She forges Mr. Tran's identity. I think the post-Dubin through line of these cases from the circuit courts is when an individual pre-selects someone's identity in order to essentially, not as an ancillary feature, but to make the transaction go. It doesn't have to make the transaction go on both sides. It can go on one end or the other or even in the middle as was the case here. That is a satisfaction of being a key mover, as one of the phrases from Dubin says, of the fraud. Well, in the indictment for the aggravated identity theft account, and in the argument, was there any tie to anything other than the wire transfer as the basis for the aggravated identity theft? If I understand your Honor's question, the wire fraud count on September 14th, that is the predicate of the aggravated identity theft. Yes, the predicate offense is, as Judge Niemeyer talked about legally, this compilation of elements. And I think this goes to the legal discussion we were having, Judge Niemeyer. What is odd about their argument is that Dubin comes in and has a very holistic impressionistic analysis. It uses fairly vague terms like at the crux of, a key mover in. It does not single out a single element of the predicate offense. Dubin was a healthcare fraud case as the predicate offense. They didn't say, well, you have to deal with a health company that does an interstate commerce. What we look at, what we think Dubin requires or asks for is a holistic assessment of essentially the common nucleus of operative fact, to borrow from civil litigation terms, of what was this predicate crime and how was this means of identification being used. Do I understand you be arguing that the record shows here that Ms. McDonald used Tran as the justification and the persuasion for making the transfer? For the settlement company, yes. That was the second transfer, wasn't it? The first transfer is different. Which one did you charge in terms of the fence, the predicate offense, in terms of wire, the wire fraud? Because that's what you look at. It's the money coming from what? It's from the EDA's bank. This is stipulation number three to the seller, Mr. Vaught's bank, is what I thought. Right. And that's what you charge. That's the only wire fraud charge, right? That's the only wire fraud in that, is that predicate. The wire transfer from the EDA's bank, I thought you said went to the settlement company. That's my understanding, Your Honor, yes. You didn't charge that, though. That's the key to here. You're trying to transfer the next transfer and say the identity fraud came with the second one. But you charged that from EDA's to the bank. That was completed at that point. That's the one you charged. That's the predicate offense. So that's what Dubin says. The crux of that predicate offense has to be identity, correct? Could I understand the facts again, what you understand the transfers? Yes, Your Honor. And start with the EDA's bank. Yes, Your Honor. And again, this is my understanding. I will doubly confirm this after we're done. Is that the way we charged it is that the whole wire is a transfer from one bank to the other that went in Interstate Commerce. That is stipulation number three that the parties agreed to. You said earlier it was a transfer from EDA to the settlement company. And I just want to explain, Your Honor. I don't know, honestly, that that stipulation disambiguates between the two. And so that's why I'm struggling to give you a direct answer because I'm standing here today and this is on me for not knowing this better. But I think the stipulation doesn't exactly make clear. Well, what in fact happened? Don't we know where the money went? Yes. It went from the EDA bank to where? What was the next landing point? My understanding is it's held by the settlement company. And then that gets transferred to the receiving bank of the seller. Not the settlement company's bank. Yes. Are you sure about that? Not the settlement company's bank, the settlement company. Are you sure about that in terms of as counsel, you represent to the court that it went, what bank did it go from EDA to what? To where? You can't tell us, can you? I apologize. Yes, Your Honor. I don't want to misrepresent the facts of it. I know. I appreciate that. Well, where would I find that evidence? In other words, in the record, if you were looking, it went from the EDA bank to whom? That's the only question. Your Honor, I believe coming into this argument that it went from the EDA's bank to TLC, the settlement company.  Yes. And she told the settlement company that. But they didn't give the settlement company two million in cash. I mean, it had to go to some. Why don't you send us a 28-J letter if you're able to find this? Because I think we're asking questions about some fairly essential facts. I would be happy to, Your Honor. And I apologize that I don't have better answers on the facts of the record in this case. To Your Honor's point about legally, though, we do think that it is not a wire, but we don't single out a element. So I think today the questions have suggested that we do try to look at the transaction holistically. I'm happy to talk briefly about the delay issue. Judge Niemeyer, obviously you're familiar with Smith. I think we would add an important fact to Smith, which is to say that's even stronger in this case, is that the district court found as a fact below that this particular jury was attentive. And further, they conceded that below. So in addition to some of the other reasons showing that this case is very substantially similar to Smith, that is a fact that is even more in favor of affirmation in this case. Additionally, there was, of course, just overwhelming evidence of guilt in this case. I'm happy to discuss that if the court has any questions about that or any other issues. Thank you. All right. Ms. Trodd, do you have some rebuttal? So you can start if you know. If you can tell us where on the record we find where the money went from the EDA's bank to who. So the indictment charges, and I'll start with the indictment. The indictment in count one, the wire fraud charges, that the wire transfer of $2 million from an account held at First Bank & Trust in the name of the EDA to an account held at Union Bank & Trust in the name of TLC Settlements. So the wire fraud charged in count one is the movement. So that's the money went from the EDA's bank to the settlement company. Yes, Your Honor. Okay. That's the wire fraud charged in count one. What page is that on in the appendix? Page 41 is the indictment. Testimony about the bank and the bank's representations in Robert Boyd's testimony. Which bank are we talking about? First Bank, EDA's bank, the originating bank that held EDA's money. At JAA 1486, he testifies about Ms. McDonald telling him that the VDOT needs to see $2 million in an escrow at TLC Settlements by a certain date. But I want to clarify that there was never any testimony that TLC Settlements required any particular representation by Ms. McDonald or really anything in order to accept this money. And I would point the court to JAA 6623. This is an email sent by Ms. McDonald to Tracy Bowers at TLC Settlements on August 22nd of 2016, so well before any transfer occurs, where she says, Tracy, I have some funds that need to be wired to you guys for closing your handling in September. Could you send me the wire instructions and I will have that sent to you? And Tracy responds, here you are, my dear, and sends the wiring instructions. At that point, Ms. McDonald can wire the money. Tracy Bowers doesn't ask who's this for, what this is about. And in fact, on August... She can wire the money out of the EDA's account. Right, which is the wire fraud alleged in count one. And on August 29th, Tracy Bowers writes back to her and says, I don't see we've received a contract on this. All I have is your money, LOL. I think that money is referring to the earnest money at that point, rather than the deposit of the two million, since that didn't happen until later. But it's clear they're accepting the money without any particular documents attached to it. Robert Boyd, who was the president of First Bank, EDA's bank... Is it essential that the bank know the purpose? In other words, if McDonald had structured and set that transaction up using TRAN, even though she didn't inform the bank and they didn't require it, would TRAN be at the core of that transaction then? That's what they seem to be saying, that she has created a structure, a scheme, which uses TRAN's name in order to justify that money out. Now, when you talk to the bank, she doesn't explain that. She just says, transfer this money for a closing. But at some point, somebody's going to look at it, and she structured the deal in the name of TRAN. Is that sufficient to engage TRAN in it? That's what she told TLC Settlements, but that's not what she told... I understand. I'm not talking about who told what. I'm talking about what, in fact, was her justification for the transfer. And was TRAN the name used for that whole transaction, right? The justification for the transfer of the $2 million out of EDA's account into the settlement company, TLC Settlements' account, did not involve TRAN. It involved the statement to the bank. Not statements to. What was the purported reason that the settlement company was getting the money? The settlement company... They were getting the money to pay who? They were getting the money in order to... This is the part that involved TRAN as the representation she made to the settlement company. But I want to clarify something as well for you, which is the wire fraud is complete when the wire is sent. If the wire bounces back... I understand. That goes to the sufficiency. But the question goes factually. If this was a transaction created by her using TRAN, even though she didn't inform the parties at the time, she was creating the documentation to justify the whole transaction. It seemed to me notice isn't necessary, but that goes to the scope of the scheme, which is the whole transfer is carried out in the name of TRAN, even though she didn't tell the banks. May I respond to that, Your Honor? Please, of course. I think that is very similar to the Second Circuit case Omotayo, which is a case where the Second Circuit found that wire fraud was not actually sufficient under Dubin, where the defendants had created a fraudulent document with the victim's identity, but it wasn't actually central to the scheme and they didn't actually use it. And the Second Circuit recognized the mere fact that you're using someone's identity fraudulently in relation to a scheme is not sufficient. And I think this is similar here. I think we're in agreement with the government that the court has to look at this holistically rather than by element. I think the government is the one that has brought the elements question into this. But looking holistically at the offense of wire fraud charged in Count 1, that offense, that transfer of the $2 million out of EDA's account, did not rely on Curt TRAN and would have been proven absent Curt TRAN. Thank you, Your Honor. All right. We'll adjourn court for the day and actually sign E.D.I. and come down and greet counsel. This honorable court stands adjourned. Sign E.D.I. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee